UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ENERGY POLICY ADVOCATES,<br><br>Plaintiff,<br><br>v.<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>Defendant. | Case No. 1:22-cv-01497 (TNM) |

### MEMORANDUM OPINION

Plaintiff Energy Policy Advocates (EPA) submitted two Freedom of Information Act requests to the Securities and Exchange Commission for emails and messages discussing proposed disclosure requirements. After EPA filed the complaint in this lawsuit, the Commission disclosed several dozen pages of responsive records, but it completely withheld five pages of relevant records under the deliberative process privilege. The Commission moves for summary judgment, while EPA challenges the adequacy of the Commission's search and its invocation of privilege. The Court will grant summary judgment: The Commission performed an adequate search and satisfied its burden under the deliberative process privilege.

I.

In April 2022, EPA filed two FOIA requests seeking disclosure of emails and other electronic messages sent to and from various Commission officials. *See* Compl. ¶¶ 8-14, ECF No. 1; Def.'s Statement of Genuine Issues of Mat'l Fact (Def's SMF) ¶¶ 1–2, ECF No. 18. The first request sought all text messages and other "non-email" electronic communications sent between several Commission officials and Treasury Secretary Janet Yellen or any of several

White House officials between September 1, 2021, and April 20, 2022.[1]  Compl. ¶ 8; Def.'s SMF ¶ 1.  The request also sought any non-email electronic messages including the terms "GHG(s)", "climate risk," or "CRD" that were sent or received by those Commission officials during the same period.  Def.'s SMF ¶ 1.  The second FOIA request sought any emails sent to or from specified Commission officials that contained "@nrdc.org," "@sustainableFERC.org, or "@EF.org" between September 1, 2021, and April 22, 2022.  *Id*. ¶ 2.

The Commission responded to the FOIA requests shortly after EPA filed this lawsuit.  Def.'s SMF ¶¶ 3–6.  For the first request, the Commission identified five pages of responsive records but withheld them in full under FOIA Exemptions 5 and 6—the deliberative process privilege and personnel privacy exemptions.  Decl. of Carrie Hyde-Michaels (Hyde-Michaels Decl.) ¶¶ 7–8, ECF No. 17-2; *see* 5 U.S.C. § 552(b)(5), (6).  For the second request, the Commission released 79 pages of partially redacted records.  Hyde-Michaels Decl. ¶¶ 9–11.  EPA challenges the adequacy of the Commission's search and its withholding of the five pages of responsive records under the deliberative process privilege.  *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n), ECF No. 18.

The Commission moves for summary judgment.  It maintains that its search was reasonably calculated to uncover all relevant documents and that it properly withheld the relevant documents under the deliberative process privilege.  *See* Def.'s Mot. for Summ. J. (MSJ) at 1, ECF No. 17-5.  The Commission's motion is ripe.  This Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

---

[1] The Commission officials include Gary Gensler, Allison Herren Lee, Frank Buda, Prashant Yerramalli, and Angelica Annino.  The White House officials include David Hayes, Ali Zaidi, Gina McCarthy, and Philip Guidice.  Compl. ¶ 8; Def.'s SMF ¶ 1.

## II.

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). To prevail, the moving party must show that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Under FOIA, agencies must produce relevant requested documents "unless the documents fall within one of nine enumerated exemptions." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021). On summary judgment, the agency "bears the burden of proving the applicability of claimed exemptions." *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011). Typically, it does so through declarations or affidavits describing how the FOIA exemption applies to the information that the agency has withheld. *See id.*; *Shapiro v. DOJ*, 893 F.3d 796, 798 (D.C. Cir. 2018). The Court may grant summary judgment based solely on the agency's affidavits or declarations "if they contain reasonable specificity of detail . . . and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (cleaned up).

## III.

The only remaining issues are the adequacy of the Commission's search and its invocation of the deliberative process privilege. The Court addresses each issue in turn.

### A.

EPA first challenges the adequacy of the Commission's search. Under FOIA, the Commission "must show that it made a good faith effort to conduct a search for the requested

3

records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The Commission "can establish the adequacy of its search via affidavits or declarations that 'explain in reasonable detail the scope and method of the search.'" *Amiri v. Nat'l Sci. Found.*, 20-cv-2006, 2021 WL 4438910, at *3 (D.D.C. Sept. 28, 2021) (quoting *Morley v. CIA*, 508 F.3d 1108, 1121 (D.C. Cir. 2007)). Though the Commission need not set forth the details of its search with "meticulous documentation," it still must "describe what records were searched" and "by whom." *Murray v. Fed. Bureau of Prisons*, 741 F. Supp. 2d 156, 163 (D.D.C. 2010) (cleaned up).

If the Commission's affidavits or declarations are sufficiently detailed, "the burden shifts to the FOIA requester to produce 'countervailing evidence' suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 236 (D.D.C. 2017) (quoting *Morley*, 508 F.3d at 1116).

The Commission's declarations show that it complied with the search request to the letter. First, the Commission's Office of Information Technology (OIT) conducted an electronic search of email correspondence from the named officials for the requested dates using the exact keywords EPA designated in its FOIA request. *See* Hyde-Michaels Decl. ¶¶ 9–10. This search produced 79 pages of responsive documents. Def's SMF ¶ 4. Though the Commission did not search for responsive emails in personal accounts, Commission staff stated that they do not use their personal addresses for work-related business. Hyde-Michaels Decl. ¶ 13.

Second, the OIT ran a search for non-email electronic messages sent to or from the named officials on Jabber, the Commission's internal messaging platform. Hyde-Michaels Decl. ¶ 7. It also searched those messages for the specified terms "GHG," "climate risk," and "CRD." *Id*. This search returned one responsive message containing the term "GHG." *Id*.; Decl. of Mark

Tallarico (Tallarico Decl.) ¶ 11, ECF No. 17-3.  Since Commission staff can only send Jabber messages internally, OIT did not search for Jabber communications with the external recipients named in EPA's request.  Hyde-Michaels Decl. ¶ 14.  Nor did OIT conduct searches on other messaging platforms such as Teams, WhatsApp, or Signal, which the Commission officials avowed they did not use for Commission business during the relevant period.  *Id*. ¶¶ 16–17.

Last, Commission staff searched the text messages on the named officials' work phones.  Though text messages sent or received on agency-issued cell phones are not stored on a central system searchable by OIT, Hyde-Michaels Decl. ¶ 14, Commission staff worked with the named officials to individually search their work phones for messages to the outside officials as well as messages containing "GHG(s)," "climate risk," or "CRD."  Tallarico Decl. ¶¶ 6–10.  These searches returned no messages with the outside officials but returned four pages of text messages containing the requested search terms.  *Id*. ¶ 11.

EPA challenges the adequacy of the Commission's search on several grounds.  None persuades.

First, EPA contends that the Commission is required to name the specific employees who conducted the search.  Pl.'s Opp'n 4–5.  Not so.  Courts have "repeatedly rejected the argument that an agency's declaration must identify the individuals, by name, who conducted the searches."  *Freedom Watch, Inc. v. Mueller*, 453 F. Supp. 3d 139, 149 (D.D.C. 2020).  In any case, an agency can satisfy the "by whom" requirement by "rely[ing] on an affidavit of an agency employee responsible for supervising the search, even if that individual did not conduct the search herself."  *Id*. at 150 (quoting *Truesdale v. DOJ*, 803 F. Supp. 2d 44, 50 (D.D.C. 2011)).  The supplemental Hyde-Michaels declaration describes the declarant's supervisory role in processing the requests.  Supp. Decl. of Carrie Hyde-Michaels (Supp. Hyde-Michaels Decl.)

¶¶ 1–3, ECF No. 19-1.  This satisfies the agency's burden of describing "by whom" the search was conducted.

Second, EPA asserts that the Commission failed to construe its search terms liberally because it did not search for "written-out" or plural versions of the specified terms.  Pl.'s Opp'n at 5.  But the Commission declarations note that searches for "GHG" and "CRD" would automatically return results for plural versions of those terms.  Supp. Hyde-Michaels Decl. ¶¶ 5–6.  As for the argument that Commission was also required to search for the "written-out" forms, EPA cites no authority suggesting that agencies are required to guess the meaning of every requested acronym.  To the contrary, "the FOIA requester is the 'master' of the FOIA request," *People for Am. Way Found. v. DOJ*, 451 F. Supp. 2d 6, 12 (D.D.C. 2006), and the requester has the obligation to "reasonably describe[] the records sought," 5 U.S.C. § 552(a)(3)(A); *see also Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("The agency [is] bound to read [the FOIA request] as drafted, not as . . . [plaintiff] might wish it was drafted.").  When a FOIA plaintiff specifies the terms it wants searched, a failure to search for variants of those terms is on the plaintiff, not the agency.

Last, EPA argues that the Commission's search was inadequate because it did not search for responsive documents in personal email accounts.  Pl.'s Opp'n at 5.  As the Hyde-Michaels declaration explains, the Commission is not able to directly search correspondence on any non-Commission email accounts.  Hyde-Michaels Decl. ¶ 13.  Commission staff therefore asked the employees named in the request whether they used their personal email for Commission business, and they responded that they did not.  *Id*.

Countering this assertion, EPA points to the Commission's disclosure of emails that Chair Gary Gensler had forwarded from his personal email account to his work account.  Pl.'s

6

Opp'n at 5–6. But the release of these documents does not suggest that Gensler or any other official conducted Commission business from a personal account without forwarding those emails to their official account, as the law requires. *See Wright v. Admin. for Child. & Fams.*, 15-cv-218, 2016 WL 5922293, at *8 (D.D.C. Oct. 11, 2016) ("With respect to official communications created on agency employees' personal accounts, . . . federal law has required that such communications be preserved within and by the agency."); C.F.R. § 1236.22(b) (requiring agencies that allow employees to send and receive official emails using personal accounts to preserve such emails in the appropriate agency recordkeeping system). If anything, the disclosure of the emails forwarded from Gensler's account suggests that Gensler complied with his obligation to preserve work emails addressed to his personal account. *Accord Wright*, 2016 WL 5922293, at *8 ("[Courts] presume[e] . . . that agency employees comply with applicable law and, consequently, that agency records responsive to a FOIA request would unlikely be located solely in their personal email accounts.").

The Commission's search corresponded precisely with the parameters set forth in the FOIA requests. EPA's claims to the contrary are speculative and do not overcome the presumption that Commission officials complied with agency policies on the preservation of work-related correspondence.

**B.**

Consider now the applicability of Exemption 5 to the five pages of text messages and Jabber messages withheld by the Commission.

Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law" to a party in litigation with the agency. 5 U.S.C. § 552(b)(5). Documents "normally privileged in the civil discovery context" need not be

7

produced under this exemption. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). This includes documents falling under the common-law deliberative process privilege, which "shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sierra Club*, 141 S. Ct. at 785 (cleaned up). The deliberative process privilege encourages candor and improves agency decisionmaking by ensuring that subordinates "feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

A document qualifies for the deliberative process privilege if it is both predecisional and deliberative. *See Sierra Club*, 141 S. Ct. at 786. "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id*. Beyond satisfying these two requirements, the agency must offer "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021). "[B]oilerplate and generic assertions that release of any deliberative material would necessarily chill internal discussions" are insufficient. *Id*. at 370.

1.

The withheld messages are both pre-decisional and deliberative. As the Commission's *Vaughn* index indicates, the messages all predated the proposed rulemakings—which EPA does

8

not challenge. Vaughn Index, ECF No. 17-4. The Commission also explains that the messages were deliberative because they reflected the consultative discussions regarding two proposed rulemakings. The messages addressed the subject matter covered by the Commission's proposed rulemakings, as well as the content and wording of specific provisions. *Id*. at 2–3. Such messages are deliberative. Indeed, it would be hard to imagine content more clearly exemplifying the "give-and-take of the consultative process" than informal internal agency dialogue about the nuts and bolts of a proposed rulemaking. *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 364.

EPA nonetheless complains that the Commission's *Vaughn* index entries are repetitive and insufficiently detailed. Pl.'s Opp'n at 7–8. To the contrary, the *Vaughn* index describes specific content withheld, distinguishing, for example, between messages addressing the rulemaking's content and those addressing edits to proposed language. *See, e.g.*, Vaughn Index at 2 (text message discussed whether proposed climate-related disclosure rule "would address particular subject matter"); *id*. (Jabber message made "assessment about whether to include particular provisions" in proposed rule); *id*. (text message addressed "edits to the language" in proposed rule); *id*. at 3 (text message discussed "potential edits" to proposed rule). If the Commission's descriptions here are repetitive, it is because the withheld messages relate to the same climate-related rulemakings. *See Hall & Assocs. v. EPA*, 633 F. Supp. 3d 35, 73 (D.D.C. 2022) (concluding that "many *Vaughn* index entries contain[ed] the same language . . . because many of the withheld documents [were] similar").

As for detail, the amount required will depend on the nature and content of the documents. When the withheld content are mere text messages—not, say, detailed memos or expert reports—a short description will typically permit "adequate adversary testing of the

agency's claimed right to an exemption." *Davidson v. United States*, 264 F. Supp. 3d 97, 110 (D.D.C. 2017) (quoting *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986)).  After all, requiring an agency to provide granular descriptions of texts would, in effect, require disclosing the information the deliberative process privilege is supposed to protect.  How much can one say to describe a privileged sentence or two without giving the game away?  *See King v. DOJ*, 830 F.2d 210, 224 (D.C. Cir. 1987) (explaining that agency affidavits must "disclos[e] as much information as possible without thwarting the exemption's purpose").

### 2.

Along with showing that withheld material is predecisional and deliberative, the Commission must "concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70.  Perfunctory statements that disclosure would "jeopardize the free exchange of information . . . will not suffice."  *Id*. at 370 (cleaned up).

The Commission's initial declaration made only generic assertions that disclosure of the predecisional messages would "chill discussions regarding SEC proposed rulemaking."  Tallarico Decl. ¶ 15.  But the Commission appended an additional declaration to its reply memorandum providing a more "focused and concrete" explanation of foreseeable harm.  *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 370.

The additional declaration notes that "[w]hen proposing and drafting a rule, SEC staff must consider a wide variety of options, including rule focus, breadth, and language."  Decl. of

Elizabeth M. Murphy (Murphy Decl.) ¶ 6, ECF No. 19-2.[2]  Staff are encouraged to have a "variety of views and opinions on a proposed rule" and may "change their view of what approach is best during the process of drafting a rule" during collaborations with colleagues.  *Id*.  According to the declaration, Commission staff would be "reluctant to record their views and engage in open discussion during the rule drafting process" if they knew that FOIA requests might expose these off-the-cuff conversations.  *Id*. ¶ 7.  This chilling effect "could adversely affect rulemaking because good solutions are often found as staff share all possible approaches."  *Id*.  Indeed, as the declaration explains, avoiding any chilling effect is particularly important when deliberations involve "controversial proposals and sensitive topics" that benefit from open and expansive discussion on "all aspects of the proposal" including any "differing viewpoints." *Id*. ¶ 9.  If Commission staff were dissuaded from exchanging their views over email or text message, it would "slow down the rulemaking process" because such views would be shared in meetings instead.  *Id*. ¶ 7.

      This explanation of future harm is not "generalized" or "boilerplate."  Rather, it is similarly focused and concrete as explanations of harm that other courts have found adequate.  *See Machado Amadis v. DOS*, 971 F.3d 364, 371 (D.C. Cir. 2020) (holding agency affidavit adequately explained that disclosure of internal attorney work product would "discourage line attorneys from candidly discussing their ideas . . . thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals." (cleaned up)); *Lawyers' Comm. for Civil Rights v. Office of Mgmt. and Budget*, 18-cv-645, 2023 WL 3433978, at *9 (D.D.C. May 12, 2023) (finding agency's *Vaughn* index adequately explained

---

[2]  The Commission included the Murphy declaration in its Reply Memorandum.  ECF No. 19.  Though the Court ordered EPA to cross-move for summary judgment—meaning it would have had an opportunity to respond to this reply—it failed to do so.

that disclosure of inter- and intra-agency deliberative communications would "inhibit OMB's ability to have frank and open discussions on policy matters with other parts of the Executive Branch."). Because the Commission explained how the disclosure of messages proposing changes to and discussing the subject matter of a proposed rulemaking would lead staff to be less forthcoming in future rulemaking discussions, it satisfied its burden of showing foreseeable harm.

The additional declaration also explains that release of the withheld messages would lead to public confusion "by suggesting that views and approaches that were dismissed or changed during the drafting process are still relevant options being considered." Murphy Decl. ¶ 8. Consistent with the Commission's concern, "the D.C. Circuit has long recognized that the risk of public confusion 'has a special force with respect to disclosures of agency positions or reasoning concerning proposed policies.'" *Reps. Comm. for Freedom of the Press v. U.S. CBP*, 567 F. Supp. 3d 97, 122 (D.D.C. 2021) (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1436 n.10 (D.C. Cir. 1992)). Releasing the Commission officials' candid discussions, which might contradict the final rulemaking, would cause harmful confusion.

EPA cites several cases that conclude that the agency's explanation of future harm was vague or "boilerplate" and contends that the Commission's explanation here is even less specific. If specificity is measured by word count, then EPA has a point. But the Court has no bias against brevity—especially when the "context and purpose" of the withheld information support a finding of foreseeable harm. *See Energy Pol'y Advocs. v. DOS*, 19-cv-03307, 2023 WL 4198200, at *3 (D.D.C. June 27, 2023).

The "context and purpose" of the withheld messages strongly supports a finding of foreseeable harm. Text messages containing internal informal discussions about proposed

12

rulemaking arguably "lie at the core of the deliberative-process privilege." *See Machado Amadis*, 971 F.3d at 370. It does not require a particularly lengthy or nuanced explanation to demonstrate that disclosure of such materials would chill frank conversations in other proposed rulemakings. In contrast, EPA cites cases that applied the deliberative process privilege to factual descriptions and expert reports—in other words, content that is less obviously deliberative. *See Project on Gov't Oversight, Inc. v. DHS*, 18-cv-2051, 2023 WL 2139380, at *9 (D.D.C. Feb. 21, 2023); *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370–71. Given the "context and purpose" of the withheld information in those cases, courts reasonably demanded that the agencies more fully explain the foreseeable harm they would suffer if the information were released. Here, the explanations offered in the declaration were sufficient.

In sum, the Commission has adequately explained the sensitive nature of the information contained in the withheld text messages, the important role these exchanges play in its decisional process, and the effect disclosure would have on similar future exchanges. This satisfies the deliberative process privilege's "foreseeable harm" requirement. *See Machado Amadis*, 971 F.3d at 371.

## C.

Finally, consider segregability. EPA contends that in refusing to disclose any portions of the text messages, the Commission failed to properly segregate factual and nondeliberative material, as required by 5 U.S.C. § 552(a)(8)(A)(ii)(II). Pl.'s Opp'n at 7. But it provides no bases for inferring that the handful of relevant text messages contained information that was not "inextricably intertwined with deliberative material." *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 203 (D.D.C. 2007) (cleaned up). Instead, it contends that the

Commission's decision to fully withhold the text messages "surely and necessarily . . . hid[] factual and nondeliberative material from view." Pl.'s Opp'n at 7. But EPA's bald assertion of bad faith defies common sense: An attempt to segregate factual or nondeliberative material from the withheld text messages would likely leave only a few incoherent fragments, if anything. The mere fact that no segregable materials were disclosed does not overcome the presumption that Commission "complied with the obligation to disclose reasonably segregable material." *Elec. Priv. Info. Ctr. v. FBI*, 17-cv-121, 2018 WL 2324084, at *6 (D.D.C. May 22, 2018) (cleaned up). The Commission thus satisfied its burden to "demonstrate that all reasonably segregable material has been released." *Johnson v. Exec. Off. of U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

## IV.

For these reasons, the Court will grant the Commission's Motion for Summary Judgment. A separate order will issue today.

Dated: October 23, 2023                                             TREVOR N. McFADDEN, U.S.D.J.